UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SUBARU OF AMERICA, INC., | : | HONORABLE JOSEPH E. IRENAS |
| | : | |
| Plaintiff, | : | CIVIL NO. 08-6218(JEI)(KMW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| DDB WORLDWIDE COMMUNICATIONS | : | |
| GROUP, INC., | : | |
| | : | |
| Defendant. | : | |


**APPEARANCES:**

FRANKFURT KURNIT KLEIN SELZ, PC
By:  Patrick J. Boyle, Esq.
     Maura J. Wogan, Esq.
     Marisa Sarig, Esq.
488 Madison Avenue, 9th Floor
New York, NY 10022
          Counsel for Plaintiff

SORINROYERCOOPER LLC
By:  Michael B. Roth, Esq.
     Joshua H. Epstein, Esq.
515 Madison Avenue, 13th Floor
New York, NY 10022
          Counsel for Defendant


**IRENAS**, Senior District Judge:

This is a contract dispute between Subaru of America, Inc.,

("Subaru"), and its former advertising agency, DDB Worldwide

Communications Group, Inc. ("DDB").[1]  DDB presently moves for

summary judgment on Counts 2 though 4 of the Second Amended

---

[1]  The Court exercises diversity of citizenship subject
matter jurisdiction pursuant to 28 U.S.C. § 1332.  The parties
are completely diverse and the amount in controversy well-exceeds
$75,000.

Complaint.[2]  For the reasons stated herein, the Motion will be granted in part and denied in part.

# I.

Subaru asserts that DDB breached certain terms of the "Agreement" that governed the parties' relationship during the period of January 1, 2005 through 2007 and part of 2008.[3]  To understand the contract's provisions, however, some background concerning the advertising business in the United States is necessary.

Large national retailers, such as Subaru (which sells automobiles), hire outside advertising agencies to handle almost every aspect concerning the national advertising of their products. While the ad agencies apparently provide a wide array of services, including the actual production of advertisements, at issue in this case are the "media buying and planning" services DDB performed on Subaru's behalf.[4]

---

[2]  The Court previously denied Subaru's Motion for Summary Judgment as to Count 1 of the Amended Complaint.  Since that time, Subaru has amended its Complaint once again but Count 1 was unaffected by the subsequent amendment.

[3]  The Agreement is dated "[a]s of January 1, 2005," and was signed by Subaru on February 10, 2005 and by DDB on February 4, 2005.  In October, 2007, Subaru terminated the agreement pursuant to the Agreement's 180-day notice provision.  (Mayer Decl. Ex. A)

[4]  Because media planning and buying "require[s] in-depth knowledge of the ever-changing media landscape, industry experience and relationships with the media outlets" ad agencies "typically" delegate these services to an affiliate "dedicated exclusively" to media planning and buying.  (Mayer Decl. ¶ 6)  In

Media planning is the process whereby the ad agency creates a "strategic plan" for delivering the "advertiser's creative message" to the "proper audience in the most cost-effective manner." (Mayer Decl. ¶ 7)  Media buying is the purchasing of commercial time from the appropriate national and local television stations in order to best achieve the media plan's objectives.  (Mayer Decl. ¶ 9)[5]  The ad agency purchases commercial time for its clients "based in large part on the GRPs [('gross ratings points')][6] that the stations project will be achieved by a particular television schedule." (Mattimore Decl. ¶ 4).  In other words, through its media planning and buying, the ad agency tries to ensure that its clients' "television ads [will] be seen by an advertiser's target audience" (Mattimore Decl. ¶ 3), by placing the right advertisement on the right network, at the right time.

After the media planning and buying has occurred, ad agencies also conduct "post-buy analyses" to determine whether the

---

this case, DDB delegated media planning and buying for: (a) the national cable and broadcast networks (such as CNN and NBC); and (b) the local stations for individual markets (such as Philadelphia, Chicago, and Miami) to its affiliates, Prometheus and Spot Plus, respectively.  No one disputes, however, that DDB ultimately remained contractually responsible for the actions of its affiliates.

[5]  Media planning and buying can encompass other types of media, such as print and digital media (Mayer Decl. ¶ 5), but the instant dispute concerns only television advertisements.

[6]  "GRPs are the sum of the individual programs ratings for a schedule.  Ratings are calculated, and published, by third parties like the Nielsen Company." (Mattimore Decl. ¶ 4)  High GRPs indicate a large number of viewers.  (See Mayer Decl. ¶ 11)

television stations performed as expected.  (See Mattimore Decl. ¶ 7; Mayer Decl. ¶ 15)  The post-buy analyses generally look for two problems: "underdeliveries" and "violations."

An underdelivery occurs when a television station fails to deliver a minimum number of viewers (expressed in GRPs) for the commercial time purchased.  (Mayer Decl. ¶ 12; Mattimore Decl. ¶ 4) Because the price of commercial time is based upon GRPs (Mattimore Decl. ¶ 4; Mayer Decl. ¶ 11), when a station underdelivers, an advertiser such as Subaru has quite literally not gotten what it paid for.

Violations, on the other hand, can occur in several different situations.  Most commonly, a station commits a violation by running a commercial too frequently ("double-spotting"), running a commercial during a prohibited program ("restricted programming"), or simply running the wrong commercial ("trafficking").  (Mayer Decl. ¶ 14)

When post-buy analyses reveal underdeliveries or violations, the ad agency asks the television stations for "make goods"-- free additional commercial time intended to make up for the problem. (Mattimore Decl. ¶ 6; Mayer Decl. ¶ 16)  "Sometimes the Stations agree to provide make goods, and sometimes they refuse if they disagree that a make good is owed."  (Mattimore Decl. ¶ 8)  Subaru does not dispute that the stations ultimately decide whether to provide a make good.

Relevant to the instant Motion, Subaru asserts that over the

course of the parties' contractual relationship, DDB failed to pursue certain make goods, leaving approximately $5 million-worth of make goods unclaimed.  Subaru also asserts that it was entitled to terminate the parties' agreement upon 90-days notice, rather than 180-days, based on its subsequent discovery that a key DDB employee did not bill any time to Subaru's account in 2007.

The relevant provisions of the Agreement are as follows:

1.   <u>APPOINTMENT OF AGENCY</u>

[Subaru] (hereinafter 'you') desires to retain the services of [DDB] (hereinafter 'we' or 'us') to provide effective marketing and advertising communications and advice in marketing your products.  Accordingly, you hereby engage and appoint us as your Agency of Record in the United States for your automotive products to provide strategy development, creative development and production, media planning, buying, monitoring and post-buy analysis, day-to-day account service, competitive tracking and reporting, billing and budget reporting.

. . .

2.   <u>AGENCY SERVICES</u>

We will perform for you the specific services set forth in . . . Exhibit A [to this Agreement.][7] In addition, we will perform the following general services . . .

. . .

(iv)     Through our affiliated company . . .

---

[7]  Exhibit A provides, in relevant part, "[i]n the broadest sense, [DDB] will be engaged to provide a full service advertising program for [Subaru]. . . . This includes the entire process– from strategy and creative development to media planning/buying and overall advertising plan implementation. . . . [DDB will provide a] full-service media team dedicated to delivering . . . formal media planning, negotiating and buying . . . and post-buy analyses."

provide media planning.

(v)     Through our affiliated company . . . contract . . . for and otherwise obtain . . . time . . . for . . . broadcasting . . . your advertising, endeavoring to secure the most advantageous rates available.

(vi)    Check and verify . . . broadcasts . . . to such degree is normally performed by advertising agencies.

(vii)   Audit invoices for space, time, material preparation and services.

(viii)  Review, approve and pay invoices for media, production and other third party charges.

(ix)    Provide post-buy analyses and obtain 'make goods' or credits.

. . .

10.  <u>TERMINATION</u>

(a)  The term of this agreement shall commence as of the date hereof and shall continue in full force and effect unless terminated by either party giving the other not less than 180 days prior written notice of such termination. . . . You may terminate this agreement on 90 days prior written notice if there is a personnel change or reduction in the job responsibilities of . . . Peter Hempel, the Executive Vice President, Managing Director.

. . .

17.  <u>GENERAL PROVISIONS</u>

. . .

(f)  We will endeavor to the best of our ability to guard against any loss to you through failure of media or suppliers to

-6-

> execute properly their commitments but we
> shall not be held responsible for any
> failure on their part in the absence of
> gross negligence or willful misconduct on
> our part.

> (g)  To the extent we are able to do so, we
> will verify all media invoices by
> obtaining from the media . . . proof of
> performance of . . . television time and
> we will confirm the accuracy of all media
> charges.  These services will include
> post buy analyses and negotiation of make
> goods.  Upon reasonable notice . . . we
> will make our files and records
> pertaining to the above material
> available to you for examination.

(Epstein Decl. Ex. B)

Count 2 of the Second Amended Complaint asserts that DDB breached the Agreement "by failing to ensure that Subaru obtained the full amount of credits and make goods for its media buying expenditures." (Second Amend. Compl. ¶ 52)  Count 3 asserts that DDB breached the Agreement by "failing to accede to Subaru's demand to terminate the [Agreement] on 90 days notice, and accordingly Subaru is entitled to a refund of the monthly fees it paid during the 90 day period beyond the proper 90 day notice period."  (Id. ¶ 59)  Count 4 seeks a declaratory judgment that DDB is "obligated under the terms if the Agreement to negotiate any and all available credits and make goods due to Subaru in connection with media charges expended in 2006 and 2007."  (Id. ¶ 64)[8]

---

[8]  As noted previously, Count 1 of the Second Amended Complaint alleges an independent breach of a different provision of the Agreement.  It is not implicated by the instant Motion.

DDB moves for summary judgment on Counts 2 through 4.

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 325). The role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"Summary judgment, of course, looks only to admissible evidence." *Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*, 826 F.2d 1335, 1339 (3d Cir. 1987); *see also Blackburn v. United Parcel*

-8-

*Service*, 179 F.3d 81, 95 (3d Cir. 1999)(noting that hearsay statements that are inadmissible at trial should not be considered when determining whether Plaintiff has established a triable issue of fact).

### III.

The Court first addresses the Counts related to make goods (Counts 2 and 4) and then turns to Count 3 concerning termination.[9]

### A.

With regard to Subaru's contention that DDB breached the Agreement by failing to pursue make goods (Count 2 of the Second Amended Complaint), DDB makes two arguments in support of its Motion for Summary Judgment: (1) pursuant to paragraph 17(f), Subaru must establish that DDB was grossly negligent in failing to pursue make goods, and Subaru's evidence fails to meet this standard; and (2) Subaru has come forth with no admissible evidence proving that DDB failed to obtain make goods (i.e., Subaru cannot prove that DDB breached the Agreement).  Both arguments fail.

---

[9]  The Agreement provides that "This agreement and all issues collateral thereto shall be governed and construed in accordance with the laws of the State of New Jersey pertaining to contracts made and to be performed entirely therein without regard to its conflict of laws and policies."  (Epstein Decl. Ex. B, paragraph 17(e))  The parties agree that New Jersey law applies.

**(1)**

Paragraph 17(f) of the agreement provides, "[DDB] will
endeavor to the best of our ability to guard against any loss to
[Subaru] through *failure of media* or suppliers to execute properly
their commitments but [DDB] shall not be held responsible for *any
failure on their part* in the absence of gross negligence or willful
misconduct on [DDB's] part."  (Epstein Decl. Ex. B) (emphasis
added)  With this provision in mind, DDB attempts to characterize
Subaru's breach of contract claim for make goods not as a failure
on its part, but rather "a result of the [television] Stations'
purported failure to provide make goods for underdelivery and
violations."  (Moving Brief, p. 22)  According to DDB,

> it is the Stations, *not DDB*, that are responsible for
> delivering ratings and complying with Subaru's
> guidelines [concerning double-spotting, restricted
> programs, and trafficking].  As a result, the only way
> for Subaru to recover the dollar value of any
> underdelivery or violation from DDB is to demonstrate
> that Subaru's *loss* was *caused* by DDB's *gross negligence*.
> . . . Subaru cannot possibly meet this burden.

(Id., p. 22-23)(italics in original).

DDB mischaracterizes Subaru's claim.  Subaru's breach of
contract claim is based upon its assertion (supported by the
evidence discussed further *infra*) that DDB simply failed to ask the
television stations for make goods in the first place.  Perhaps
paragraph 17(f) would apply if DDB asked the television stations

for the make goods and the stations refused,[10] but here Subaru's claim is based on evidence that DDB simply failed to act on underdeliveries and violations revealed by the post-buy analyses.

The Agreement's language is clear.  DDB agreed to "verify all media invoices by obtaining from the media . . . proof of performance of . . . television time and . . . confirm the accuracy of all media charges.  These services will include post buy analyses and negotiation of make goods."  (Epstein Decl. Ex. B, paragraph 17(g))  DDB's asserted failure to "negotiate" make-goods after discovering underdeliveries and violations-- as opposed to any failure of the television stations to actually provide a make good-- is a breach of paragraph 17(g) the Agreement.  Paragraph 17(f) simply is not implicated because Subaru asserts DDB's failure, not the stations' failure.  Thus, Subaru need not prove DDB's gross negligence in order to prove that DDB breached its clear obligation to ask the television stations for make goods.[11]

### (2)

Next, DDB challenges the sufficiency of Subaru's proof that it

---

[10]  That issue is not before the Court, and the Court makes no ruling on it.

[11]  While a television station's refusal to provide a make good is not directly relevant to whether DDB breached its agreement with Subaru, this fact is relevant to the calculation of Subaru's resulting damages.  Even if DDB failed to pursue $5,072,318.00-worth of make goods, calculation of the actual loss to Subaru may involve complex factual and legal issues.

failed to pursue certain make goods.[12]  There is no genuine dispute
that Subaru has put forth evidence from which a reasonable
factfinder might conclude that DDB failed to pursue make goods, but
DDB contends Subaru's evidence, which the Court describes next, is
inadmissible, and therefore cannot be considered.  Subaru, on the
other hand, contends its evidence is admissible.

Subaru almost exclusively relies upon audit reports created by
its "media auditor" Performance Analysis Group, Inc. ("PAG"), which
was retained by Subaru from the beginning of Subaru's contractual
relationship with DDB specifically to double-check DDB's post-buy
analyses.  (See Mayer Decl. ¶ 41; Shain Decl. ¶¶ 13, 15)  According
to Kevin Mayer, who was Subaru's Director of Marketing
Communications during the relevant time period, "Subaru . . .
engaged PAG to prepare [] quarterly repots as a tool to help DDB
identify and obtain make-goods."  (Mayer Decl. ¶ 41)

PAG performed quarterly audits beginning in the first quarter
of 2005 through the fourth quarter of 2007.  (Shain Decl. ¶ 15;
Shain Decl. Ex. F– quarterly audit reports for 2006 and 2007)  In
creating these audit reports, PAG worked directly with DDB.  DDB
gave PAG all of the data upon which PAG's audits were based, and
PAG submitted drafts of its quarterly reports to DDB so that DDB
could "rectify any inaccuracies."  (Shain Decl. ¶ 17; Mayer Decl.

---

[12]  At times, DDB seems to characterize Subaru's claim as
asserting that DDB pursued no make goods.  However, Subaru admits
that DDB did pursue some make goods.  Subaru claims that DDB
should have pursued additional make goods.

¶¶ 42, 43; see, e.g., Shain Decl. Ex. C– email to PAG from DDB's affiliate, Prometheus, transmitting data for PAG's use in its "4Q 2006 audit")

Each quarterly audit report specifically documents that DDB failed to act on certain underdeliveries and violations, and ascribes a monetary value for the make goods and credits[13] it recommends DDB should negotiate.  (See Shain Decl. Ex. F– audit reports)

DDB makes two attacks on the audit reports, and Shain's accompanying declaration and deposition testimony.

First, DDB argues that the evidence is inadmissible because paragraph 16 of the Agreement requires all audits to be performed by a CPA, and there is no dispute that neither Shain, nor anyone else employed by PAG, are CPAs.  The Court rejects this argument because paragraph 16 does not apply to audits of post-buy analyses.

Paragraph 16 provides, in relevant part,

> We will keep accurate records of transactions executed
> on your behalf in accordance with Generally Accepted
> Accounting Principles.  You will have the right . . .
> to audit our books and records relating to third party
> vendor charges, and actual staffing hours compared to
> the applicable Annual Fee/Staffing Schedule (Schedule
> C). . . . . Audits must be conducted by a licensed
> Certified Public Accounting firm or individual.

On its face, paragraph 16 makes no sense when applied to post-

---

[13]  In the audit reports, "credits" apparently correspond to violations, while "make goods" apparently correspond to underdeliveries.  The parties' briefs seem to refer to both make goods and credits as "make goods," so the Court will do the same.

buy analyses because the information contained in those reports simply cannot be kept "in accordance with Generally Accepted Accounting Principles," and a CPA, who has no specialized knowledge of the advertising field, could not conduct a meaningful audit of the information.

Moreover, the Court concludes that paragraph 17(g) applies to post-buy analyses, and notably that provision does not require a CPA audit.  Paragraph 17(g) provides:

> To the extent we are able to do so, we will verify all media invoices by obtaining from the media . . . proof of performance of . . . television time and we will confirm the accuracy of all media charges.  These services will include post buy analyses and negotiation of make goods.  Upon reasonable notice . . . we will make our files and records pertaining to the above material available to you for examination.

Thus, the Court concludes that paragraph 16 of the Agreement does not prevent this Court from considering the PAG Reports and Shain's testimony in opposition to DDB's Motion for Summary Judgment.[14]

Second, DDB argues that the audit reports and accompanying testimony by Shain is "impermissible lay opinion."  In essence, DDB reasons that the audit reports and testimony are the product of specialized knowledge, therefore such evidence may only be

---

[14]  Even if the Agreement required media audits to be performed by a CPA, the Court questions whether such a contractual provision is even relevant to the evidentiary issue of the admissibility of certain documents and testimony.  However, since the Court holds that the Agreement does not require media audits to be performed by a CPA, the Court need not answer the question.

introduced by way of an expert.[15]  According to DDB, because Subaru has not proffered Shain as an expert witness, the Court cannot consider the audit reports or his testimony.

In response, Subaru argues that the audit reports themselves are business records created in the ordinary course of business, and therefore: (1) they are admissible, and (2) such evidence is sufficient to establish a genuine issue of material fact as to whether DDB breached the agreement.

With regard to the quarterly audit reports, the Court agrees that there is no hearsay problem.  (Indeed, DDB has not raised such an objection.)  Subaru's Declarations from Mayer and Shain establish that each audit report is: (1) a "report . . .  or data compilation . . . of acts, events, conditions, [or] opinions . . . made at or near the time by . . . a person with knowledge;" (2) "kept in the course of a regularly conducted business activity;" and (3) "it was the regular practice of that business activity to make the . . . report . . . or data compilation."  Fed. R. Evid. 803(6).

The question is whether there is an independent bar precluding the audit reports.  DDB asserts that Rule 701 bars the reports, but the Court disagrees.  First, Rule 701 specifically addresses

---

[15] See Fed. R. Evid. 701 (lay witness "opinions or inferences" cannot be "based on scientific, technical, or specialized knowledge"); Fed. R. Evid. 702 (expert witnesses may testify to "opinions" based on "scientific, technical, or other specialized knowledge.").

"Opinion Testimony by Lay Witnesses" speaking only to limits on "witness[] testimony in the form of opinions or inferences." The audit reports are documentary evidence, not testimonial evidence by a witness.[16] Second, rather than drawing an inference or stating an opinion, the reports tend to prove a disputed fact: that DDB failed to pursue certain make goods on Subaru's behalf.[17] To the extent that Subaru wants to use the audit reports for that purpose, they are admissible, and sufficient to raise a triable issue of fact as to what efforts DDB made or failed to make in pursing make goods.

Indeed, the record before the Court is murky as to the quantity of make goods DDB did pursue and obtain, and the quantity it did not pursue. As noted previously, no one asserts that DDB failed to pursue any make goods, the factual question for the jury will be: to what extent did DDB pursue make goods? The PAG reports contribute to this factual uncertainty and therefore summary judgment is inappropriate.

It appears that there may be a legitimate question as to whether portions of Shain's testimony will be based on specialized

---

[16] DDB's argument lumps together the audit reports and Shain's testimony but they are separate pieces of evidence that must be analyzed individually.

[17] Indeed, DDB has never denied that it did not ask for the disputed make goods; its implicit position seems to be that it exercised its professional judgment in deciding which make goods were worth pursuing. On the other hand, Subaru asserts that DDB's decisions in that regard were not in accordance with industry standards.

knowledge, and may not be admissible as lay testimony.  But the scope of Shain's testimony at trial, and the admissibility of the audit reports for purposes not encompassed by this Opinion are issues that are more appropriately decided closer to, or during, trial.

DDB's Motion for Summary Judgment on Count 2 of the Second Amended Complaint will be denied.

**B.**

While DDB is not entitled to summary judgment on Count 2, it is entitled to summary judgment on Count 4, which seeks a declaration that DDB has a present obligation to pursue make goods owed to Subaru from 2006 and 2007.

DDB is entitled to judgment as a matter of law because it is undisputed that the parties' Agreement has been terminated. (Indeed, it was terminated by Subaru, who not only terminated it, but now asserts that it would have terminated the contract earlier if certain facts had been known at the time of termination. *See infra* Section III. C.)  Under New Jersey law, "[t]ermination . . . causes the contract to cease existing" and the parties' respective obligations under the contract are extinguished. *Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier)*, 372 B.R. 218, 222 (D.N.J. 2007); *see also* 2-6 Corbin on Contracts § 6.10 ("If the power [to terminate a contract] is exercised, both parties are freed from the promissory duties.  If it is not exercised,

-17-

neither one is freed.")   Thus, DDB has no current obligation to pursue make goods on Subaru's behalf.

If Subaru successfully proves at trial that DDB failed to pursue valid make goods in 2006 and 2007 its remedy will be compensatory damages, not an order compelling DDB to attempt to obtain make goods from 2006 and 2007.

Summary judgment will be granted to DDB on Count 4 of the Second Amended Complaint.

## C.

Lastly, in Count 3 of the Second Amended Complaint, Subaru demands three-months' worth of the fee it paid to DDB (a total of $3,753,708), asserting that while it terminated the Agreement upon 180 days notice, it was entitled to terminate the Agreement upon 90 days notice, and therefore should be refunded the extra 90 days (approximately 3 months) of fees it paid to DDB.  According to Subaru, at the time it sent DDB its formal written letter terminating the Agreement upon 180 days notice, it was unaware of grounds for terminating upon 90 days notice-- namely, that Peter Hempel had not worked on the Subaru account at all during 2007.[18]

_____

[18]   Disputed issues of fact exist as to whether there was a "reduction" in Hempel's "job responsibilities" (Epstein Decl. Ex. B, paragraph 10(a)): Hempel states in his affidavit that he "remained highly involved with the Subaru account for the entire duration of the Agreement" (Hempel Aff. ¶ 3); yet DDB does not dispute that a staffing audit revealed that Hempel billed no time specifically to the Subaru account in 2007.  *See* fn. 22 *infra.* However, because it does not alter the disposition of the instant

Subaru attempts to characterize its claim as one for breach of contract, asserting in its Second Amended Complaint that "DDB has materially breached the Agreement by *failing to accede to Subaru's demand* to terminate the account on 90 days notice." (Second Amend. Compl. ¶ 59)(emphasis added)

Subaru's claim fails because the undisputed facts demonstrate that DDB did not breach the agreement.

The Agreement does not obligate DDB to terminate the agreement upon a "personnel change or reduction in the job responsibilities of . . . Peter Hempel" (Epstein Decl. Ex. B-- Agreement ¶ 10(a))[19]; nor does the Agreement automatically terminate in 90 days upon the same condition. The Agreement merely gave Subaru a right of termination, which Subaru did not exercise.

The undisputed evidence demonstrates that on October 16, 2007, Subaru gave "Notice . . . pursuant to Section 10(a) of the Agreement, that [Subaru] is exercising its right to terminate the Agreement. The termination shall take effect 180 days from the date of this letter." (Mayer Decl. Ex. A)

Later, on November 12, 2007, Subaru "proposed" that the parties terminate their agreement effective January 15, 2008 (i.e., 90, rather than 180, days from October 16, 2007) writing, "[d]ue to

---

Motion, the Court will assume that Subaru did in fact have legitimate grounds for terminating the Agreement upon 90 days notice.

[19]   Indeed, the Agreement does not even obligate DDB to disclose such a change or reduction.

the fact that [Subaru] will not require much work from DDB after January 15th, 2008 we would like to propose January 15th, 2008 as the official end-date of our contractual relationship." (Mayer Decl. Ex. B) But Subaru admits that DDB did not agree to the proposal.[20]

The undisputed record demonstrates that Subaru never invoked its right to terminate the agreement upon 90 days notice. Its failure to exercise an option to terminate is not tantamount to DDB's breach.[21]

The fact that Subaru contends that it was not aware of grounds to terminate upon 90 days notice until a staffing audit of DDB's records was completed "during the Summer of 2008" (Subaru's Brief, p. 47)-- i.e., well after the 180 day termination period had expired-- does not change this Court's conclusion. Subaru does not allege that DDB attempted to conceal Hempel's role at DDB nor his

---

[20] Documents submitted by Subaru suggest that DDB made a counteroffer, proposing the agreement be terminated at "the end of March, 2008" which was approximately two weeks shorter than 180 days. (Mayer Decl. Ex. D)

[21] *See generally, In re Nickels Midway Pier*, 372 B.R. at 222-23 (discussing the conceptual differences between termination of a contact and breach of a contract); 2-6 Corbin on Contracts § 6.10 ("Termination occurs when a party exercises a power created by agreement or law to end a contract *otherwise than for its breach*. . . . The legal power created by [the] option to terminate . . . . is a power to terminate if the contractor so wills and desires. . . . If the power is exercised, both parties are freed from the promissory duties. If it is not exercised, neither one is freed.") (emphasis added).

involvement with the Subaru account.[22]   Moreover, it is undisputed
that the Agreement gave Subaru the right to conduct a staffing
audit *prior* to terminating the Agreement.   (See Epstein Decl. Ex.
B-- Agreement, ¶ 16 ("[Subaru] will have the right, upon reasonable
advance notice and no more frequently than annually, to audit
[DDB's] books and records related to . . . actual staffing and
hours.")).   Thus, the record evidence suggests that Subaru could
have discovered the circumstances concerning Hempel's work and
responsibilities vis a vis Subaru before terminating the Agreement.

DDB's Motion for Summary Judgment on Count 3 of the Second
Amended Complaint will be granted.


**V.**

For the reasons stated herein, DDB's Motion for Summary
Judgment will be granted as to Counts 3 and 4 of the Second Amended
Complaint and denied as to Count 2.   The Court will issue an
appropriate Order.


Dated: September 22, 2011          s/ Joseph E. Irenas
                                 **JOSEPH E. IRENAS, S.U.S.D.J.**

---

[22]   In July 2005, Hempel was promoted to President of DDB's
New York office.  (DDB's Supplemental Response to Interrogatory
Nos. 1-6)  After that time, DDB explains that Hempel billed
Subaru work to "the 'administrative' category in line with
accepted industry practice," rather than to a client number
specific to Subaru.  (Id.)  DDB directly informed Subaru's Vice
President of Marketing of the promotion before making a public
announcement.  (Epstein Reply Decl. Ex. E)

-21-